## THE STATE v. McCARVER, Appellant.

### Division Two, March 29, 1906.

1. **CHANGE OF VENUE: Prejudice of Inhabitants: Conflicting Evidence: Trial Court's Discretion.** Where the evidence, upon defendant's application for a change of venue on the ground of the prejudice of the inhabitants of the county against him, is conflicting, the trial court does not abuse its discretion in overruling the application, and its ruling will not be disturbed by the appellate court.

State v. McCarver.

2. JURISDICTION: Judge of Fifteenth Judicial Circuit: Criminal Case in Another Circuit. The judge of the Fifteenth Judicial Circuit has authority to try a criminal case in another circuit when requested so to do by the judge of such other circuit, who has been disqualified, although he has no criminal jurisdiction in his own circuit.

3. JUROR: Challenge: General Objection. Challenges for cause must be specifically stated. General objections to jurors can not be considered in the appellate court.

4. ————: Opinion: Newspaper Reports. Jurors who have formed opinions based upon newspaper reports are not thereby rendered incompetent, when they state that, notwithstanding such opinion, they can give the defendant a fair and impartial trial.

5. LOST INDICTMENT: Supplied by Copy. Where the original indictment has been lost or destroyed, the trial court has authority to adopt a certified copy as the indictment in the case, provided it appears that the indictment had been returned into court and filed.

6. REMARKS OF ATTORNEYS: No Exceptions: Affidavits. Alleged improper remarks of the prosecuting attorney can not be considered on appeal unless they are objected and excepted to and preserved in the bill of exceptions. They can not be shown by affidavits.

7. INSTRUCTIONS: Failure to Instruct: General Objection. When the instructions of the court are read to the jury, if the defendant desires further instructions, he should call the court's attention to its failure to instruct upon any matter deemed neccessary by defendant to be placed before the jury, and, in the event of the failure of the court to so instruct, he should except at the time.

8. ————: Accepted by Defendant. When defendant's counsel, at his own request, is permitted to read an instruction of the court before it is read to the jury, and, after doing so, remarks, "We have no objection; that is the law," defendant should not, on appeal, be heard to criticise the instruction.

9. ————: Read Together: Self-Defense. Instructions numbered 5 and 7a, set out in the statement, when read together, as they should be, are held to properly present to the jury defendant's right of self-defense.

10. ————: Murder, First Degree. Instruction numbered 4, set out in the statement, held to properly define the offense of murder in the first degree.

11. **MURDER, FIRST DEGREE:** Sufficiency of Evidence. Evidence *held* sufficient to support the verdict finding defendant guilty of murder in the first degree.

Appeal from St. Francois Circuit Court.—*Hon. Samuel Davis,* Special Judge.

AFFIRMED.

*W. S. Anthony, J. A. Abernathy* and *Jasper N. Burks* for appellant.

(1)   It is the absolute right of the accused to be tried in the county where the offense is charged to have been committed, but the Legislature considered that prejudice and popular feeling often run so high. that the great essential, to-wit, "an impartial jury," could not be obtained in the county, and wisely provided for the protection of the accused by directing that when, on his application, this was shown to the court, he might be tried in another county where this prejudice did not exist.   Unquestionably it secures to the accused an inestimable privilege, without which he must go through the form of a trial, whereas in fact his case is already prejudged.   Such a statute should be liberally construed, so as to attain the purpose of its enactment.   Secs. 2572, 2576, R. S. 1899; State v. Goddard, 146 Mo. 177; State v. Burgess, 78 Mo. 234.   (2) By virtue of Laws of 1875, p. 42, amended in 1897, p. 80, Hon. Samuel Davis was deprived of all criminal jurisdiction conferred upon him as judge of the circuit court of the Fifteenth Judicial Circuit of Missouri, by section 22, article 11, of the Constitution, and section 1674, Revised Statutes 1889.   Secs. 1 to 16, R. S. 1899, pp. 2564, 2465; Laws 1875, pp. 42, 43; Laws 1897, p. 8; State v. Daniels, 66 Mo. 192.   (3)   If a person has formed or expressed an opinion from conversing with a witness in the case, or read the sworn evidence taken before the coroner on preliminary examination, or if

his opinion has been engendered by hearing the witnesses testify under oath in a former trial of the same case, the uniform practice has been to reject such a person as incompetent to serve as a juror. An opinion formed under these conditions disqualifies him to act as an impartial juror, however much he may asseverate his ability to render an impartial verdict. State v. Foley, 144 Mo. 611; Higgins v. Cone, 94 Ky. 54; People v. Yoakum, 53 Cal. 566. (4) The order or judgment of the court was not sufficient to authorize the trial of defendant upon the purported copy of an indictment. Supplying the record is not finding the indictment. Courts should be careful in exercising the power of supplying lost records in a capital case. State v. Simpson, 67 Mo. 647; State v. Burks, 132 Mo. 363. (5) The verdict is not supported by the evidence. And where a verdict must be ascribed to prejudice, passion, and not to that calm weighing of the facts in evidence which should always characterize the deliberations of a jury, the Supreme Court will interfere and set it aside. This rule is uniformly announced in civil cases, and in those which are criminal the Supreme Court has never abdicated the right to overturn verdicts which are not based upon the corner stone of substantial justice. State v. Primm, 98 Mo. 368; State v. Packwood, 26 Mo. 340; State v. Burgdorf, 53 Mo. 65; State v. Mansfield, 41 Mo. 470; State v. Castor, 93 Mo. 242; State v. Gleason, 172 Mo. 259. (6) Instructions 5 and 7 limited the right of defendant to defend himself against Harry Lett, the deceased, alone, and was clearly erroneous; and instruction 7a given to the jury after argument of counsel did not cure the defect in this instruction, for the reason that instruction 7a is predicated solely on threats made by Leo Lett against defendant and not upon the testimony of witnesses as to the conversation before and appearances of Leo and Harry Lett at the time of the homicide. State v. Adler, 146 Mo. 19. Instruction 4 is erroneous, in this, that it instructs the jury that the

intentional killing of a human being with a deadly weapon without any lawful provocation must be presumed to be murder in the first degree. We understand the law to be that an intentional killing with a deadly weapon alone raises the presumption of murder in the second degree, and the burden of showing deliberation rests upon the State. State v. Silk, 145 Mo. 240; State v. Fairlamb, 121 Mo. 137. The instructions as a whole did not properly declare all the law necessary for the jury in determining their verdict on the issues in the case. They are confusing and conflicting. State v. Adler, 146 Mo. 18; State v. Silk, 145 Mo. 240.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1) Defendant's application for a change of venue, on account of the alleged prejudice of the inhabitants of St. Francois county, was properly overruled. As the evidence on that subject was conflicting, this court will defer to the ruling of the trial court. State v. Clevenger, 156 Mo. 190; State v. Albright, 144 Mo. 638; State v. Wilson, 85 Mo. 139; State v. Whitten, 68 Mo. 91; State v. Northway, 164 Mo. 520; 1 Bish. New Crim. Proc. (4 Ed.), 72; 4 Ency. Pl. and Pr., 499. (2) It is hardly necessary to argue that all of the circuit judges of Missouri do have jurisdiction of criminal causes. Constitution of Mo., sec. 22, art. 6; R. S. 1899, sec. 1673. Whenever the regular circuit judge is disqualified for any reason, it is his duty to call in a judge from some other circuit, who then possesses all of the qualifications of the regular circuit judge. R. S. 1899, secs. 1678, 2594. Again, whenever the regular judge is disqualified, he shall set the cause for trial and request and notify the judge of another circuit to come and try said cause. R. S. 1899, sec. 2597. The section of the statute on the subject of a change of venue from the criminal court of either county in the Fifteenth

judicial circuit, provides that the cause shall be transferred to the judge of the circuit court of said county; thereby conclusively showing that the circuit judge of said circuit does possess criminal jurisdiction. 2 R. S. 1899, sec. 7, p. 2564; State v. Hudspeth, 159 Mo. 210; State v. Nelson, 166 Mo. 191; State v. Nelson, 181 Mo. 340; State v. Taylor, 171 Mo. 465; State v. Blitz, 171 Mo. 530. (3) At the time juror Westgrove was qualified, defendant simply objected to said juror, but assigned no reason for his objection. Such an objection is not sufficient; it should be more specific. State v. Evans, 161 Mo. 107; State v. McGinnis, 158 Mo. 118. The same may be said of jurors Sigman and Elser; but, in addition, they showed themselves clearly qualified, as they stated that the opinions they had formed were based upon what they had read in the newspapers. Such opinions would, in no way, prevent them from giving defendant a fair trial. Certainly, they were qualified. State v. Duffy, 124 Mo. 189; State v. Hunt, 141 Mo. 630; State v. Brennan, 164 Mo. 507; State v. Reed, 137 Mo. 131. (4) "A lost indictment, like any other record, may be supplied by the court of whose record it constitutes a part. Of this, there can be no doubt." State v. Burks, 132 Mo. 367; State v. Simpson, 67 Mo. 647; State v. Paul, 87 Mo. App. 47; State v. Smith, 71 Mo. 46; Railroad v. Holliday, 131 Mo. 454. As the duty devolves upon the trial court of restoring a lost information or indictment, the Supreme Court will presume that the trial court acted correctly; and "this presumption places the restored information in the same situation, and on the same plane as if the orignal information had not become a 'dissolving view.'" State v. Walker, 167 Mo. 369. (5) The verdict is not the result of passion or prejudice, but is amply supported by the evidence. (6) Various persons make affidavits as to the alleged improper remarks of the prosecuting attorney, and his two assistants, during

their arguments. These remarks are not preserved in the bill of exceptions, neither were the proper exceptions taken to them; hence, they can not be considered by this court. State v. McAfee, 148 Mo. 370; State v. Grant, 144 Mo. 66; State v. Lamb, 141 Mo. 298; State v. Meals, 184 Mo. 260; State v. Welsor, 117 Mo. 583; State v. Grant, 144 Mo. 66. (7) Instruction 4, on the subject of intentional and deliberate killing, has never been criticised by this court; not even by the Silk case (cited by appellant), in 145 Mo. 249; State v. Cushenberry, 157 Mo. 186.

BURGESS, P. J.—On November 16, 1903, O. P. McCarver was indicted by the grand jury of St. Francois county for murder in the first degree for having, at said county, on the 14th day of November, 1903, shot and killed with a pistol, one Harry Lett. Thereafter, at the August term, 1904, of said court, defendant was put upon his trial before the court and jury, found guilty of the offense charged, and his punishment assessed at death. Defendant's motions for new trial and in arrest having been overruled, he appeals.

After defendant's arraignment and his plea of not guilty were entered of record, he made application for a change of venue of said cause on account of the prejudice of the judge of the St. Francois Circuit Court against him. The application was sustained, and Hon. Samuel Davis, judge of the Fifteenth circuit, was called in by the judge of the St. Francois Circuit Court to try the case. After a panel of forty men had been qualified to sit as jurors upon the trial of the cause, the court discharged them all on account of alleged misconduct of which he became satisfied. At the same term, however, another panel of forty qualified jurors were summoned, from which twelve were selected to act as jurors upon the trial of the case, which was then entered upon. The result was a mistrial. Defendant was again put upon his trial at the August term, 1904, of said court and, as

before stated, found guilty of murder in the first degree as charged in the indictment.

The homicide was committed at Farmington, in a saloon of which Bentley and Ryan were proprietors, about ten o'clock on Saturday evening, November, 14, 1903. Until a short time prior to the shooting, deceased had been employed in said saloon. Defendant, at the time of the difficulty, was the proprietor of another saloon in said town. A few minutes before the shooting occurred, deceased came into the saloon with a pitcher of water which he set down behind the bar. The saloon faced south, and the bar, which was twenty feet long, was on the east side. At the end of the bar was an ice chest, and behind that was the side or east door. After the deceased had put the pitcher of water behind the bar, he walked around the bar and out the front door. After he went out defendant said, "Harry [meaning deceased] is a good boy, but he has a brother that is a God damn son-of-a-bitch." After walking a short distance on the street deceased met his uncle Leo Lett, and invited him to go and take a cigar with him. Deceased and his uncle then turned and walked back to the Bentley & Ryan saloon, deceased having been absent about ten minutes.

Leo Lett and deceased walked in the front door, passed by defendant and his friends, and on to the extreme other end of the bar, and deceased called for and purchased a cigar for himself and one for his uncle. Defendant then invited all present to take a drink with him; some did so, but deceased and his uncle declined with thanks, the uncle saying that he had just had a cigar with Harry. Defendant said, "You think you are too damn good to drink with me." Defendant made the remark again, and added thereto, "Harry, you are God damn son-of-a-bitch." Deceased replied, "I am no more of a son-of-a-bitch than you are." Defendant then applied a vile epithet to deceased, which is too vulgar to be reproduced, to which deceased retorted, "same

to you." At the time of using these words defendant stepped up towards deceased, drew his pistol and shot deceased in the neck. Deceased turned and was then facing defendant, with a lighted cigar in his hand, and his left elbow leaning on the bar. The State's evidence differed as to the position of his right hand, some of the witnesses saying that the cigar was in his right hand, and others saying that his right hand was hanging down by his side. Deceased and defendant were ten or twelve feet apart, and facing each other. Just prior to the firing of the pistol, deceased's uncle (Leo Lett) stepped up and said to deceased, "Harry, let's go home, don't have any trouble." Some of the witnesses testified that after the shooting, defendant walked out the front door and said, "I don't allow no man to call me a —" (repeating the same epithet applied by him to deceased) "without I kill him." As soon as the shot was fired, deceased fell to the floor, and the bartender and Duke Powell took off his coat and overcoat and placed him on a cot. While examining these coats and while taking off his pants, no weapons of any kind were found on deceased. A physician, Dr. Fleming, was called, who, after making an examination of deceased's wound in the saloon, had him taken to the Baptist sanitarium, where he died the next day (Sunday) at five p. m. as a result of this gunshot wound.

The defendant's evidence tended to prove that defendant and deceased were both drinking at Bentley & Ryan's saloon, and that deceased left the saloon after bringing a pitcher of water, and was gone perhaps half an hour. That George Gordon heard deceased and Leo Lett talking out in front of the saloon, at which time deceased asked Leo if he got it, and Leo replied, "Yes, and a damn good one too." Deceased then asked his uncle to stand behind him, and they would go in and he would do the rest. That deceased pointed out defendant through the glass window and said, "He is in there, setting them up." That at that time defendant and

several others were standing at the bar near the front end of the saloon. Another witness, Jesse Biggs, who claimed to hear this conversation, said that deceased asked Leo if he got that pistol, to which Leo replied, ''Yes, and a damn good one too.'' Deceased then said, ''There he is in the saloon; he is pretty drunk now, and now will be our time to get him.'' That deceased and his uncle-walked by the other persons standing at the bar, called for and lighted their cigars. Defendant then told the bartender to give them a drink, but the bartender shook his head. That defendant again invited them to drink, but Leo Lett declined, saying, ''I have just had a cigar with Harry.'' That deceased said, "No, God damn you, I am not going to drink with you, you have been acting a God damn fool around here all night.'' That Leo Lett tried to slip a pistol into the right hand of deceased at that time, and Arthur Bodell called out, ''Look, Pink, [defendant] Lett has got a gun.'' Defendant fired one shot, and Leo Lett ran behind the ice chest with a pistol in his right hand. That at the time of the shooting, deceased was standing with a cigar in his left hand, his left arm resting on the bar, and his right hand in his front pants pocket. Defendant's evidence further showed that prior to this night, deceased and defendant had some trouble over a horse and also over a woman. A number of witnesses testified to threats made by deceased against the life of defendant; some of the threats were communicated to defendant, and others were not. Defendant admitted the shooting, but claimed that he did it in self-defense. He also admitted that just prior to the shooting he used all of the rough language towards deceased as detailed by the State's witnesses. Defendant testified that he saw the pistol, which Leo Lett tried to hand to deceased, and that he then thought he did hand it to deceased. That after the shooting he saw Leo Lett with the pistol in his hand, as Lett walked away behind the ice chest. Defendant further testified that he heard many of the

threats which deceased made against him, which were communicated to him prior to the final difficulty.

In rebuttal, the State's evidence tended to show that one of defendant's main witnesses, George Gordon, was not in Farmington on that night, but that he attended a shooting contest at the home of James Field, some twenty miles away, and remained at Mr. Field's all that afternoon and until the next (Sunday) morning. The State's evidence further tended to show that it was impossible for defendant's witnesses, Jesse Biggs, George Gordon and others to have seen what occurred in the saloon, as said witnesses were outside on the sidewalk, and the window curtains were raised, the curtains working from below. The defendant read to the jury the deposition of one Arthur Bodell, which corroborated defendant in many particulars; but Bodell was contradicted by his testimony before the coroner.

Defendant then offered some witnesses who testified that the curtains were raised that night, but not raised till after the shooting, and that the witness Gordon was in Farmington that night.

Then the State introduced a number of witnesses who testified to the bad character and reputation of defendant's witnesses who had testified to seeing George Gordon in Farmington the night of the shooting. Lydia Jacobs and Linnie Moore, two of defendant's witnesses, were shown to be of bad moral character.

The court, over the objections and exceptions of defendant, instructed the jury as follows:

"1. The court instructs the jury that if you believe from the evidence in this case that the defendant, O. P. McCarver, at the county of St. Francois, State of Missouri, at any time prior to the 16th day of November, 1903, willfully, deliberately, premeditatedly and with malice aforethought, shot with a pistol and by such shooting wounded Harry Lett, and that within a year and a day thereafter and before the 16th day of November, 1903, said Harry Lett, at the county of St. Francois

aforesaid, died in consequence of such shooting and wounding, you will find the defendant guilty of murder in the first degree.

"2. If you believe from the evidence that the defendant, O. P. McCarver, in the county of St. Francois, State of Missouri, at any time prior to the 16th day of November, 1903, willfully, premeditatedly, and of his malice aforethought, but not deliberately, shot and wounded Harry Lett, and that within a year and a day thereafter and before the 16th day of November, 1903, the said Harry Lett, at the county of St. Francois aforesaid, died in consequence of said shooting and wounding, then it will be your duty to find the defendant guilty of murder in the second degree.

"3. The court instructs the jury that, as used in these instructions, the term 'willfully' means intentionally; that is, not accidentally. 'Deliberately' means in a cool state of the blood, it does not mean brooded over or reflected upon for a week or a day or an hour; but it means a conscious purpose to kill, formed in a cool state of the blood, and not under a violent passion, suddenly aroused by some real or supposed grievance. 'Premediatedly' means thought of beforehand for any length of time, however short. 'Malice,' in its legal sense, does not mean mere spite or ill will, as ordinarily understood, but means the intentional doing of a wrongful act, that condition of mind which prompts one person to take the life of another without just cause or justification; and it signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief. 'Malice aforethought' means with malice and premeditation.

"4. You are further instructed that he who willfully, that is, intentionally, uses upon another at some vital point a deadly weapon, must, in the absence of qualifying facts, be presumed to know that the effect is likely to produce death, and knowing this, must be presumed to intend death, which is the probable consequence

of such an act, and if such deadly weapon is used without just cause or provocation, he must be presumed to do it wickedly and from a bad heart, and if the jury believe from the evidence that the defendant, O. P. McCarver, shot and killed Harry Lett, as charged, and that at the time or before the shot was fired, the defendant had formed in his mind the willful, premeditated and deliberate design or purpose to take the life of the deceased, and that the shot was fired in furtherance of that design or purpose and without any justifiable cause or legal excuse therefor as explained in these instructions, then the jury should find the defendant guilty of murder in the first degree.

"5. Upon the question of self-defense the court instructs the jury that if at the time defendant shot Harry Lett, he, the defendant, had reasonable cause to apprehend a design on the part of Harry Lett to take his life, or to do him some great personal injury, and that there was reasonable cause for him to apprehend immediate danger of such design being accomplished, and that to avert such apprehended danger he shot, and that at the time he shot he had reasonable cause to believe and did believe that it was necessary for him to shoot and kill to protect himself from such apprehended danger, you will acquit the defendant on the ground of self-defense. It is not necessary that the danger should have been actual or real, or that the danger should have been impending and about to fall. All that is necessary is that defendant had cause to believe and did believe this fact. On the other hand, it is not enough that he should have so believed, but he must have had reasonable cause to so believe. Whether or not he had reasonable cause is for you to determine under all the facts and circumstances given in evidence. If you shall believe from the evidence that defendant did not have reasonable cause to so believe, you cannot acquit him on the ground of self-defense, although you may believe from the evidence that the defendant really thought he

was in danger.

"6. The court further instructs the jury that, when a person has reasonable grounds to apprehend that some one is about to do him great bodily harm, and there are reasonable grounds for believing the danger imminent and that such design will be acomplished, he may safely act upon appearances, and kill the assailant if that be necessary to avoid the apprehended danger, and the killing will be justifiable, although it may afterwards turn out that the appearances were false, and that there was in fact no design to do him serious injury nor danger that it would be done, and in passing upon the question whether the defendant had reasonable ground for believing that there was imminent danger that the deceased was about to kill him or do him some great bodily harm, the jury should determine the question from the standpoint of the defendant at the time he acted and under his surroundings at that particular instant of time, and the jury must also, in passing upon that question, take into consideration the threats, if any, made by the deceased against the defendant.

"7. The court instructs the jury that they should take into consideration the threats, if any, made by deceased against the defendant. If you believe from the evidence that any threats made by deceased were communicated to defendant prior to the killing, then such threat, or threats, if any, so communicated may be considered by you as explaining the conduct and apprehensions of defendant at the time of the shooting. You may also consider any threats you may believe from the evidence were made by Harry Lett and not communicated to the defendant prior to the killing, for the purpose of explaining the conduct and demeanor of deceased at-the time of the shooting. If the jury believe from the evidence that prior to the shooting said Harry Lett had made threats against the defendant, yet this fact alone did not justify or excuse defendant for shoot-

ing deceased, if he did shoot him, and although such threats were communicated to defendant, before he shot said Lett, if at the time of the fatal shot the said Lett made no threats against defendant and made no assault upon defendant, and was making no effort or attempt to carry out such threats, then the same did not justify defendant in shooting deceased, if he did shoot him.

"8. The court instructs the jury that the defendant is presumed to be innocent, and this presumption attends and protects him at every stage of the case until it is overcome by testimony which proves his guilt beyond a reasonable doubt; and it is not enough in a criminal case to justify a verdict of guilty that there may be strong suspicion or even strong probabilities of the guilt of the defendant, but the law requires proof so clear and satisfactory as to leave no reasonable doubt of defendant's guilt.

"9. The jury are instructed that the indictment in this case is of itself a mere formal accusation or charge against the defendant, and is not of itself any evidence of the guilt of the defendant, and no juror should permit himself to be to any extent influenced against the defendant because or on account of the indictment in this case.

"10. Before defendant can be convicted of any offense under the indictment the jury must believe from the evidence that the defendant is guilty beyond a reasonable doubt. A reasonable doubt, however, must be a substantial doubt, arising out of a due consideration of all the testimony, and not a mere possibility of defendant's innocence.

"11. The defendant is a competent witness in his own behalf, and his testimony is to be weighed by the same rules that govern the testimony of other witnesses; but in weighing his testimony the jury may take into consideration the fact that he is the defendant in the case, and his interest in the result of the trial.

"12. The jury are the sole judges of the credibility of the witnesses and of the weight to be given to their testimony; and you should take into consideration the character of the witnesses, their conduct and appearances on the stand, their interest, if any, in the result of the suit, the motive actuating them in testifying, the witness's relation to or feeling for or against the defendant, or the deceased, the probability or improbability of the witness's statements, the opportunity the witness had to observe or be informed as to matters respecting which such witness gives testimony, and the inclination of the witness to speak truthfully or otherwise as to matters within the knowledge of such witness, together with all the other facts and circumstances given in evidence. If, upon a consideration of all the evidence, you conclude that any witness has willfully sworn falsely as to any material fact involved in the trial, you may reject or treat as untrue the whole or any part of such witness's testimony. By 'material fact' is meant any fact which tends to prove or disprove the defendant's guilt or innocence."

Then follows another instruction (No. 13), as to the form of the verdict, which it is unnecessary to reproduce.

After the arguments of counsel on both sides to the jury, the court withdrew instruction No. 7 from the jury and gave in lieu thereof another instruction (No. 7a), which reads as follows:

"7a. All threats which you believe from the evidence were made by either the deceased, Harry Lett, or by Leo Lett against the defendant should be considered by you in arriving at a verdict. Any threats which were communicated to defendant should be considered as explaining the conduct and apprehensions of defendant at the time of the shooting and all threats, whether communicated to the defendant or not, should be considered in passing upon the evidence as to the conduct

and demeanor of deceased and Leo Lett at the time of
the shooting. Although you may believe from the evi-
dence that prior to the shooting deceased, Harry Lett
and Leo Lett made threats against the defendant, yet
such threats alone did not justify defendant for shoot-
ing Harry Lett, and although such threats were com-
municated to defendant before the shooting, yet if at
the time defendant fired the fatal shot neither Harry
nor Leo Lett made any threat or threats against defend-
ant and made no assault upon defendant and were mak-
ing no effort to carry out such threats, then the same
did not justify defendant in shooting Harry Lett.''

The defendant again renewed his objection to the
instructions as a whole, because they did not properly
declare all the law in writing to the jury necessary
for their deliberations, which objection was by the court
overruled, and defendant excepted.

Thereupon, on the 1st day of September, 1904, the
jury returned into the court their verdict and finding,
the same having been written on the body of said in-
struction No. 13, as to the form of the verdict, as fol-
lows: ''We, the jury, find the defendant, O. P. McCar-
ver guilty of murder in the first degree. J. D. Webb,
foreman.''

The court thereupon orally informed the jury that
the verdict so returned by them was not in due form,
and that they should return to their room and correct
the same, or return another verdict written on another
sheet of paper. Said jury again returned to their room,
and within a few minutes returned into court the fol-
lowing verdict: ''We, the jury, find the defendant, O.
P. McCarver, guilty of murder in the first degree. J.
D. Webb, foreman.''

To the action of the court, and to the returning of
said verdict the defendant objected and excepted at the
time. While it was the absolute right of defendant to be
tried in the county where the offense is charged to have
been committed, such right extended no further; but

if it was made to appear to the court in the manner pointed out by the statute (sec. 2576, R. S. 1899) that the minds of the inhabitants of that county were so prejudiced against the defendant that a fair trial could not be had therein, then said case might be removed by the order of the court to the circuit court of another county in the same circuit. [Sec. 2572, R. S. 1899.] The right to a change of venue by defendant being purely statutory, it devolved upon him, in order to avail himself of that right, to bring his case within the provisions of the statute. That the evidence upon the applications were conflicting is indisputable, and under such circumstances, in the absence of proof of some fact indicating an abuse of its discretion, this court will defer to the ruling of the trial court. As was said by SHERWOOD, J., in speaking for the court in the case of State v. Albright, 144 Mo. 1. c. 642, "The evidence in favor of and against the application was heard by the trial court, and having been determined adversely to granting the change, such ruling will not be disturbed by this court, and should not be unless there had been circumstances of such a nature as indicated an abuse of the discretion lodged in the trial court, something which is not to be found in the present record." The same rule is announced in State v. Dyer, 139 Mo. 199; State v. Tatlow, 136 Mo. 678; State v. Clevenger, 156 Mo. 190; State v. Burgess, 78 Mo. 234.

When Judge Davis took the bench, in pursuance of the call of Judge Anthony, to try this case, the defendant by his counsel filed a motion or plea to the jurisdiction based on the ground that judge Davis did not have jurisdiction in any criminal case in the Fifteenth judicial circuit of Missouri, over which he presided, there being a criminal court in said Fifteenth judicial circuit having exclusive jurisdiction in all criminal cases originating in said circuit, or which go there for trial upon change of venue. The contention is that section 2597, Revised Statutes 1899, only conferred upon Judge An-

thony, who was disqualified to try the cause, the power
to call in, to try the cause, the judge of some other cir-
cuit who possessed all the qualifications of a circuit
judge under the law, and that as Judge Davis had no
authority under the law to try criminal cases in the cir-
cuit in which he presides, he possessed no such author-
ity elsewhere, and, therefore, was without authority to
try this case. That Judge Davis has no authority to try
criminal cases in the circuit in which he presides will
be conceded, because by section 4, p. 2564, Revised Stat-
utes 1899, jurisdiction is expressly conferred upon the
criminal court of that circuit to try all cases that orig-
inate therein, and by section 7 of the same act it is pro-
vided that all criminal cases removed from any county
to any of the counties composing said criminal judicial
circuit shall be certified to, tried and determined by said
criminal court in the county in which the same may be
sent. But it does not necessarily follow that Judge
Davis was without authority to try this case. The ap-
plication for the change of venue under consideration
was based upon the ground that the Hon. R. A. Anth-
ony, judge of the circuit court of St. Francois county,
was biased and prejudiced against the defendant, and
would not afford him a fair trial, and said application
conformed to the provisions of section 2594, Revised
Statutes 1899. The record discloses that the applica-
tion was sustained, and an order entered of record, which
recites that "the said defendant and prosecuting at-
torney have failed to agree in writing to elect some at-
torney-at-law, who possesses all the qualifications of a
judge of the circuit court, as special judge in said cause,
this cause is set down for trial" on Tuesday, the 2nd
day of February, 1904, and Hon. Samuel Davis, judge
of the Fifteenth judicial circuit of Missouri, is request-
ed to be present and preside in this court at the trial of
said defendant." [Sec. 2597, R. S. 1899.] This section
of the statutes, under the circumstances stated, makes
it the duty of the court granting the change to set the

case for trial on some day of the term, or on some day as early as practicable in vacation, and to notify or request the judge of some other circuit to try the cause; and the statute also makes it the duty of the judge so requested to appear and hold the court at the time fixed and vests him with full power and authority during the trial of said cause to perform all the duties of a circuit judge at a regular term of such court. The statute authorizing the calling of a judge of another circuit to preside at the trial of a certain criminal cause pending in another circuit, under the circumstances and conditions therein provided, makes no exception against any judge who may not have jurisdiction of criminal cases in the circuit court in which he presides, because such jurisdiction is conferred upon a criminal court in that circuit; nor can any such exception be inferred from or read into the statute. Its terms apply to all circuit judges in this State, and the fact that Judge Davis did not have jurisdiction to hear and try criminal cases in the Fifteenth judicial circuit in no way disqualified him from hearing and trying such in another circuit, when requested to do so by the judge presiding therein under the conditions provided by the statute. Suppose that in one county only of the Fifteenth circuit there was a criminal court having exclusive jurisdiction of criminal cases, would it be contended from that fact that Judge Davis would be disqualified from hearing and trying a criminal case in any other circuit when properly requested so to do by the judge of that circuit? Or, suppose Judge Anthony, under the provisions of section 1678, Revised Statutes 1899, had requested Judge Davis to hold the term or part of the term of the St. Francois Circuit Court, and Judge Davis had presided at the trial of defendant, could it be claimed that he was without authority to try the case because he had no authority to hear and try criminal cases in his own circuit? We think not. There is no difference in principle between the two propositions.

State v. McCarver.

Judge Samuel Davis has on several occasions, in response to requests made by the judge of the criminal court of Jackson county, presided at the trial of cases in that court. At one of such trials (State v. Taylor, 171 Mo. 465), the defendant was convicted of murder in the first degree, and upon appeal to this court the judgment was affirmed, with directions that the sentence of the law be executed. In addition to Taylor's case may be mentioned State v. Hudspeth, 159 Mo. 178; State v. Blitz, 171 Mo. 530; State v. Nelson, 181 Mo. 340; State v. Nelson, 166 Mo. 191, and in none of them was it ever intimated or suggested, so far as the records therein disclose, that he had no jurisdiction; nor do we think there can be any question as to his jurisdiction to try the case at bar.

It is claimed by defendant that Martin Westover, Abe Elser, N. A. Kinkead and James F. Sigman, who were selected as qualified jurors on the panel of forty, from which twelve were selected to sit as jurors upon the trial of the cause, were not qualified to sit as such jurors, and that the court erred in allowing them to remain on the panel of forty. The objection against Westover was general, no reason for the objection having been given, and it has been ruled by this court that the objection must be specific. [State v. Taylor, 134 Mo. 109; State v. Evans, 161 Mo. 95; State v. McGinnis, 158 Mo. 105.] The same may be said with respect to the objection to jurors Sigman and Elser. Besides, their examination touching their qualifications as jurors showed them to be clearly qualified, as it appeared that the opinion which each had formed was based upon newspaper reports of the homicide, and both stated that they could try the case fairly. Such opinions did not, under the circumstances, disqualify them as jurors. [State v. Duffy, 124 Mo. 1; State v. Hunt, 141 Mo. 626.] In State v. Duffy, supra, it is said: "Persons who have formed opinion of the guilt or innocence of one accused of crime, from rumor or newspaper reports, are not for

194 Sup—47

that reason rendered incompetent to sit as jurors on the trial of the case, where they answer upon their *voir dire* that they can give the defendant a fair and impartial trial.'' Nor is a person who states that he has ''formed an impression or opinion as to the guilt or innocence of the accused, and that such opinion has been formed either from rumor or newspaper reports, or both, which it would require evidence to remove, an incompetent juror, provided it further appears to the satisfaction of the court that such opinion will readily yield to the evidence in the case, and that such juror, notwithstanding such opinion, will determine the issue upon the evidence adduced on the trial, free from prejudice or bias.'' [State v. Walton, 74 Mo. l. c. 275; State v. Cunningham, 100 Mo. 382.] Or that he can, under such circumstances, give the defendant a fair and impartial trial. [State v. Hunt, 141 Mo. 626.] In State v. Brennan, 164 Mo. 487, a juror stated in his *vior dire* that he had formed an opinion of the guilt or innocence of the defendant from newspaper reports only, and that the burden would be on the defendant to change this opinion, but further stated that all he knew of the case was what he had gleaned from the newspapers; that he was entirely free to be governed by the evidence and could render a fair and impartial verdict. The juror was held to be competent. So in State v. Reed, 137 Mo. 125, a juror was held to be competent who stated that he had formed an opinion, from rumor and newspaper accounts, as to the guilt or innocence of the accused, which it would require evidence to remove, and that if such rumor was not contradicted by evidence his opinion thus formed would be bound to have some influence upon him in arriving at a verdict; but that he could give the defendant a fair and impartial trial, and acquit him, unless the evidence warranted a different verdict.

The challenges to these jurors were only general,

nothing more than saying "We object to Sigman and Elser," and simply amounted to the statement of a legal conclusion. It is well settled that challenges for cause must be specifically stated. [State v. Taylor, 134 Mo. 109; People v. Reynolds, 16 Cal. 128; Mann v. Glover, 14 N. J. L. 195; Powers v. Presgroves, 38 Miss. 227; Drake v. State, 20 Atl. 747; 2 Elliott's Gen. Prac., sec. 530.] "Fairness to the court and to adverse counsel alike demands the grounds of the challenge for cause to be particularly set forth." [State v. Taylor, supra.]

About the time the jury was selected to try the case, it was discovered that the indictment upon which the defendant was then on trial was lost. It was then shown by the records of said court that an indictment had theretofore been found by a grand jury of St. Francois county, returned into the court and filed in the office of the clerk of the circuit court of said county, charging the defendant with murder in the first degree, in having killed and murdered, at said county, one Harry Lett with a pistol, a certified copy of which said indictment had been furnished by the clerk of said court to the prosecuting attorney of said county and was then in evidence before the court. The trial court then, by an entry of record, after hearing evidence that satisfied the court that the original indictment had been lost or destroyed and that the copy was a true copy of the original indictment, adopted this certified copy of the indictment as the indictment in the case, and then proceeded with the trial. Defendant claims that this was error; that the loss of the indictment could not be supplied in that way, and that supplying the record is not finding the indictment. It was held in State v. Simpson, 67 Mo. 647, that while no power is conferred by statute to supply a lost indictment, such power exists independent of any statute, and authorizes a court in which an indictment has been found by a grand jury of the county, when such indictment has been lost

or destroyed, to allow a paper, proved to be a copy, to be filed as for the indictment, provided it appears, either from the record or from the testimony of witnesses, that the indictment was returned into court and filed. The same question was before this court in State v. Burks, 132 Mo. 363, wherein GANTT, P. J., in speaking for the court, said: "A lost indictment, like any other record, may be supplied by the court of whose record it constitutes a part," citing State v. Simpson, supra, and State v. Smith, 71 Mo. 45. In the case of State v. Walker, 167 Mo. 366, it is held that "where the certificate of the clerk of the court states that the information on which defendant was tried was not 'the original information filed in this cause, but a copy, as permitted to be restored by the court,' it must be presumed that the restoration was correctly made." The action of the court in allowing the copy of the lost indictment to be filed as and for the indictment was fully authorized by the previous rulings of this court, and there can be no question as to the power of the trial court in this regard.

Counsel for defendant complain in their brief of alleged improper remarks by the prosecuting attorney respecting his failure to bring witnesses to impeach the reputation of the defendant. Whatever may have been his statements, they are not preserved in the bill of exceptions, and as such cannot be shown by affidavits, as was attempted to be done in this case, they cannot be considered upon this appeal. The authorities are all one way upon this subject. [State v. Welsor, 117 Mo. 570; State v. Lamb, 141 Mo. 298; State v. Grant, 144 Mo. 56; State v. McAfee, 148 Mo. 370.]

Instructions numbered 5 and 7 are criticised upon the ground, as claimed, that they limited the right of defendant to defend himself against Harry Lett, the deceased, alone, and were erroneous, and that the withdrawal from the jury of instruction numbered 7 and

the substitution of instruction numbered 7a, after argument of counsel, did not cure the defect in said instruction numbered 7, for the reason that instruction numbered 7a is predicated solely upon the threats made by Harry Lett against defendant, and not upon the testimony of witnessess as to the conversation before the appearance of Leo Lett and Harry Lett at the time of the homicide. The only objection made by defendant to the instructions, so far as the record discloses, up to the time they were read to the jury, was as follows: "To the giving of which instructions, and each and every one of them from one to thirteen inclusive, the defendant, by his counsel, objected for the reason that said instructions, severally and collectively, do not properly declare in writing *all* the law necessary for the jury in their deliberations." The record then shows that the court gave instruction numbered 7a, and following immediately thereafter, the record recites: "And which was read to the jury in lieu of instruction numbered 7, heretofore read to the jury and withdrawn as aforesaid. The defendant again renewed his objections to the instructions as a whole, because they did not properly declare all of the law in writing to the jury necessary for their deliberations, which objection was by the court overruled, to which action of the court in overruling defendant's objection to said instructions defendant, by his counsel, then and there objected and saved his exceptions at the time."

The record further shows that after said instruction numbered 7a had been prepared by the court, and before it was read to the jury, one of defendant's counsel was, at his own request, permitted to read it, and after doing so, he remarked, "We have no objection; that is the law, only it is hard to read," thus showing that this instruction was not objected to, but was given by and with defendant's assent, and he cannot now be heard to criticise it. Defendant's objections to all other

instructions was that they ''did not properly declare all of the law, in writing, to the jury necessary for their deliberations.'' The only construction which can be placed upon this objection is that the instructions did not cover all the points of law involved in the case, and not that they were in any respect erroneous. We have held that when the instructions of the court are read to the jury, and the defendant desires further instructions, it is his duty, in fairness to the court, to call its attention to any matter of law arising in the case upon which the court had failed to instruct, and which was deemed necessary by defendant to be placed before the jury in order that they might arrive at a just verdict, and in the event of the failure of the court to so instruct, it becomes the duty of the defendant to except at the time. [State v. Bond, 191 Mo. 555.] But conceding, for the sake of the argument only, that timely objections were made and exceptions saved to instructions numbered 5 and 7a, such instructions, when read together and in connection with each other, as they should be, embraced the right of defendant to defend himself against both Harry and Leo Lett, were exceedingly fair to the dedefendant and beyond criticism, and presented that feature of the case properly to the jury.

We are unable to appreciate the criticism upon instruction numbered 4, to the effect that it instructs the jury that the intentional killing of a human being with a deadly weapon, without any lawful provocation, must be presumed to be murder in the first degree. The instruction does not so state; nor does the case of State v. Silk, 145 Mo. 240, or State v. Fairlamb, 121 Mo. 137, so hold. On the contrary, it is said in Silk's case that a homicide committed by the use of a deadly weapon, and without deliberation, is murder in the second degree. The same rule was announced in the Fairlamb case. The instruction under consideration, in defining murder in the first degree, tells the jury that in order to convict defendant of that offense, they must first be-

lieve that the killing was with deliberation and premeditation. It says, "If the jury believe from the evidence that the defendant, O. P. McCarver, shot and killed Harry Lett, as charged, and that at the time or before the shot was fired, the defendant had formed in his mind the willful, premeditated and deliberate design or purpose to take the life of the deceased, and that the shot was fired in furtherance of that design or purpose, and without any justifiable cause or legal excuse therefor, as explained in these instructions, then the jury should find the defendant guilty of murder in the first degree." The instruction is in line with all the authorities as to what it takes to constitute murder in the first degree, and is free from objection.

No one can read the testimony disclosed by this record without coming to the conclusion that the evidence fully supports the verdict. There is nothing in the record which tends in the least to show that the verdict was the result of prejudice or bias against the defendant. Upon the other hand, the testimony clearly shows that the homicide was deliberate and premeditated, and without the slightest excuse or justification. The instructions are free from objection and were very fair to the defendant. He had, we think, so far as disclosed by the record, a fair and impartial trial, and must now bear the punishment which the law imposes for its transgression.

Finding no reversible error in the record, we can but affirm the judgment, and direct that the sentence pronounced be executed. It is so ordered. *Gantt, J.,* concurs; *Fox, J.,* not sitting.